A. N. KIRTLAND *et ux. v.* GEORGE G. CORBETT *et ux.*

## (*Nashville,* December Term, 1920.)

1. **LICENSES.** Plaintiffs for damages for breach of contract held shown to be real estate dealers required to pay privilege tax.

    In an action to recover damages for the breach of a contract for the purchase of a house and lot, evidence *held* to show that plaintiffs were real estate dealers at the time the contract was executed and were required by Acts 1915, chapter 101, section 4, as amended by Acts 1917, chapter 70, to pay a privilege or occupation tax. (*Post, pp.* 110, 111.)

    Acts cited and construed: Acts 1915, ch. 101, sec. 4; Acts 1917. ch. 70.

    Cases cited and distinguished: Taylor v. Vincent, 80 Tenn., 282; Saunders v. Russell, 78 Tenn., 297.

2. **LICENSES.** Burden held upon plaintiff to show she was not re quired to pay occupation tax.

    In action by husband and wife for damages for breach of a contract for purchase of a house and lot standing in the name of the wife, *held,* that the burden was on the wife to show that she was not engaged in the business of buying and selling real estate and was not required to pay a privilege tax, in view of evidence showing that the lot was purchased for the purpose of sale and other purchases and sales made by the wife. (*Post, pp.* 111, 112.)

    Case cited and approved: Gilley v. Harrell, 118 Tenn., 128.

3. **LICENSES.** Buying, improving, and selling lots held engaging in "real estate business" requiring payment of tax.

    A person engaged in buying unimproved lots, improving them, and then selling them, is engaged in the "real estate business" within the meaning of Acts 1915, chapter 101, section 4, as amended by Acts 1917, chapter 70, requiring payment of privilege tax by real estate dealers. (*Post, p.* 112.)

Kirtland et ux. v. Corbett et ux.

4. **LICENSES.** Failure to pay real estate dealer's privilege tax fatal to action for damages for breach of contract.

Persons engaged in the real estate business were not entitled to recover damages for the breach of a contract for the purchase of real estate, where they had not paid the privilege tax as required by Acts 1915, chapter 101, section 4, as amended by Acts 1917, chapter 70. (*Post, p.* 112.)

## FROM DAVIDSON.

Appeal from the Chancery Court of Davidson County. —Hon. Jno. T. Lellyett, Chancellor

Stokes & Stokes, for appellants.

Jno. Wesley Gaines,—Jno. B. Daniel and Tytton Taylor, for appellees

Mr. Justice McKinney delivered the opinion of the Court.

The bill in this cause was filed on July 31, 1918, by the complainants, A. N. Kirtland and wife, Lillie B. Kirtland, against the defendants, George G. Corbett and wife, Sarah B. Corbett, to recover damages for the breach of a contract for the purchase of a house and lot on Seventeenth avenue in the city of Nashville.

The defendants filed a cross-bill, by which they sought to have said contract canceled as a cloud upon their title.

The first defense interposed to the bill was that the complainants were real estate dealers at the time said contract was executed, and had not paid the privilege tax required by law, and that as a result said contract, which is the basis of the suit, was illegal and unenforceable.

The record shows conclusively that neither of the complainants had paid a privilege tax as dealers in real estate.

The lot in question was conveyed by T. Graham Hall to Mrs. Kirtland as a separate estate by deed bearing date of December 5, 1916, the recited consideration being $1,425 cash; but as a matter of fact a note was executed for the $1,425 and a deed of trust executed by Kirtland and wife to W. B. Ballard, trustee, to secure said note.

Said lot had no improvements on it when purchased by the complainants, but some time during the following spring they began the construction of a two-story brick veneer residence on said lot, and during the course of such construction, to-wit, on July 9, 1917, the complainants entered into a written contract with the defendants, by which the latter agreed to purchase said house and lot for the sum of seven thousand five hundred dollars, and which contract the defendants breached.

The question is: Were the complainants, at the time said contract was entered into, dealers in real estate within the meaning of the statute?

Section 4 of Chapter 101 of the Acts of 1915 provides that "each vocation, occupation and business hereinafter named in this section is hereby declared to be a privilege," etc. It then provides that "real estate dealers and agents and land companies doing a real estate business" shall pay a specified tax.

The foregoing act was amended by chapter 70 of the Acts of 1917, the latter act reading as follows:

"Land Agents and Real Estate Dealers.—Land agents or real estate dealers or any person opening up sub-

Kirtland et ux. v. Corbett et ux.

divisions to any town or city for the purpose of selling lots or otherwise," etc.

In 17 Corpus Juris, 1154, it is said:

"Dealer.—A dealer, in the common acceptation, and therefore in the legal meaning of the word, is not one who buys to keep or makes to sell, but one who buys to sell again: one who buys and sells at his place of business; one who buys for the sole purpose of selling again; one who buys to sell as an avocation or business; one who buys with the intention of selling; one who sells what he buys; a person who buys and sells for the purpose of gain and profit; one who buys to sell to others at a profit. Also, one who acts between man and man, to have transactions of any kind with; the middle man between the producer and the customer of the commodity, the word not necessarily being confined to one who sells his own property only. In a more comprehensive sense the term sometimes is applied to one who acquires, possesses, handles, and sells a commodity, whether he has bought it to sell again or not; one who trades, buys, or sells; a vendor of merchandise; one who distributes; a keeper.

"More Than a Single Sale.—Although a man commences to be a dealer from the moment when he buys the article with an intention to sell it again, the term implies a habitual course of dealing, and usually is employed to designate one who makes a business of buying and selling; one whose business it is to buy and sell, as a merchant, shopkeeper, or broker—a trader; one who makes successive sales as a business; a person who seeks his living by buying and selling; a person engaged in the

business of buying and selling merchandise or other personal property in the usual course of trade. As importing a plurality of sales, the term as used in revenue and license statutes has been applied to dealers and chapmen, dealers in drugs and medicines, dealers in fresh meat, dealers in intoxicating liquors and spirits, dealers in pistols, dealers in secondhand goods, and dealers in tobacco. But while a single sale of all the merchandise which a person has on hand, who is going out of a business formerly carried on by him, does not constitute him a dealer, yet a single sale, if accompanied by evidence of a preparation and readiness by the vendor to make other sales, will bring him within the meaning of the term.''

In *Taylor* v. *Vincent*, 12 Lea, 282, 47 Am. Rep., 338, a ''dealer'' is defined as:

''A middleman between the manufacturer or the purchaser and the consumer. . . . A dealer . . . is not one who buys to keep, or makes to sell, but one who buys to sell again. He stands immediately between the purchaser and the consumer, and depends for his profits not upon the labor he bestowes on his commodities, but on the skill and foresight with which he watches the markets.''

In *Saunders* v. *Russell*, 10 Lea, 297, it is said: ''Dealing in goods, it has been held by this court, implies not only selling but buying to sell as an avocation or business.''

The test is, therefore: Was Mrs. Kirtland engaged in buying and selling seal estate as a vocation, occupation, and business?

It is conceded that Mr. Kirtland was a real estate dealer without license. The bill contains the following averment:

"That said property was not built for a home to be occupied by complainants but to be sold, dealing in real estate being the business in which A. N. Kirtland was engaged."

Mrs. Kirtland did not testify in the cause, but Mr. Kirtland did, and we here set forth his evidence bearing upon this question, to wit:

"Q. What business were you engaged in in July, 1917, and a few years previous thereto?

"A. In building and constructing houses for sale.

"Q. Were you building and constructing them on other people's real estate, or property that belonged to you and your wife?

"A. Mostly on property that belonged to my wife.

"Q. Were you engaged in general real estate business. If not, state how that was?

"A. No sir; I was not engaged in the general real estate business. I was in the business of buying lots and constructing houses and selling them.

"Q. What is the street number of the house involved in this case?

"A. 1616 Seventeenth Avenue South.

"Q. When did you buy, if you did buy, that lot?

"A. December 1, 1916.

"Q. What is the frontage of that lot?

"A. Fifty feet front, 152½ feet deep.

"Q. You mean the lot upon which you built both houses, or the one involved in this case?.

"A. No, sir; just this house, the one involved in this suit.

"Q. How much did you pay for that lot?

"A. $1,425.

"Q. For what purpose did you buy it?

"A. To build on and afterwards make a sale.

"Q. In whom was the title to this property taken.

"A. My wife, Mrs. Lillie B. Kirtland.

"Q. You spoke of buying the lumber. What about the other material; who bought that for the house?

"A. I purchased the majority of the material.

"Q. Who else bought any besides you?

"A. Mr. Parman usually looked over the material before it was finally purchased.

"Q. You say Parman looked over the material. Who bought the material?.

"A. I purchased the material,.

"Q. Did you have to borrow money in order to erect this house?

"A. I did.

"Q. From whom did you borrow?

"A. Mr. J. H. Wiles, Jr.

"Q. How much did you borrow from him?

"A. $4,000.

"Q. Where did your wife live at the time you married her?

"A. East Nashville, Boscobel street.

"Q. What was her maiden name?

"A. Lillie Bernal.,

"Q. Did she have any property when you married her?

"A. No, sir.

"Q. Has she acquired any by inheritance or gift since that time?

"A. No, sir.

"Q. How many years have you been engaged in the real estate business?

"A. Something like twelve or thirteen.

"Q. Is your wife engaged in the real estate business with you?,

"A. She buys property at times.

"Q. What is the difference between your real estate business and your wife's real estate business?

"A. She makes purchases at my suggestion many times after she looks at property to see what she thinks about it.

"Q. How is that different from your own business?

.A. She accumulates stuff for her support in case of my death.

"Q. In what way does her real estate business differ from your real estate business?

"A. I don't understand the question.

"To the stenographer:

"Q. Restate the question.

"Q. In what way does her real estate business differ from your real estate business?

"A. The property she purchases, if it is vacant property, I will make an effort to improve it; if it is improved property and needs repairs, I look after the repairing of it.

"Q. Do you put all of your accumulations in her name?

"A.   No, sir; I do not.   In several instances it is in my own name.

"Q.   Have you anything in your own name now?   If so, where?

"A.   I have in the firm name Roth-Kirtland Realty Company.

"Q.   When did you become a member of that firm?

"A.   A little over a year ago.

"Q.   You owned considerable property in your wife's name?

"A.   We had considerable.

"Q.   What property did you own in your wife's name

"A.   Two pieces of property on Belmont boulevard south of Belmont College; two pieces of property on Seventeenth avenue, north of Belmont College; one piece of property on the corner of Twentieth avenue and Bellcourt street, No. 1800 Twentieth Avenue South.

"Q.   That makes how many pieces in all?

"A.   That is five I have mentioned.

"Q.   What was the reasonable market value of these five in September, 1917?

"A.   About $37,500.

"Q.   What was the reasonable market value of the house involved in this action in September, 1917?

"A.   $7,500.

"Q.   How many transactions in real estate did you and your wife have during the years 1916, 1917, and 1918?

"A.   It is impossible for me to state that.

"Q.   Did you have few or many?

"A.   Quite a number."

The witness then admits, upon cross-examination, some thirty eight real estate transactions had by himself and wife during the three years just mentioned, but the details and exact nature of these transactions are not given.

The witness further testified:

"Q.   State whether or not on April 3, 1916, you and your wife didn't have an important real estate transaction with W. G. Bratton with relation to lots 49-50 in Wilson Spring addition?

"A.   V. G. Bratton.

"Q. You had the transaction?

"A. What do you mean by transaction?

"Q. I mean you had some transaction with respect to real estate?

"A. Yes, sir; we often sold and bought real estate.

"Q. You and your wife still have a good many of these pieces of property, and some of them you have sold?

"A. We have sold most of them.

"Q. What was the first piece of property your wife acquired after your marriage?

"A.   It has been so long back I can't recall.

"Q.   Do you remember how she acquired it?

"A.   I gave it to her.

"Q. You gave her the various other pieces of property you refer to in your deposition?

"A. Yes, sir; I gave it to her.   I try to provide for her in case of my death.

"Q. You thought your property would be safer in her hands?

"A. Just for the reasons I have stated. Put it in her hands so that she would have a competence in case of my death.

"Q. What property have you acquired right recently?

"A. A farm in this county.

"Q. Where?

"A. Out near Newson Station.

"Q. What value?

"A. I place a valuation on it of $50,600.

"Q. Farms are worth money?

"A. yes, sir; going up every day.

"Q. How long have you owned that farm?

"A. About three months.

"Q. Put the title to that in your name or your wife's?

"A. In the Roth-Kirtland Realty Company. I beg your pardon, it was put in my wife's name and Mrs. Roth's."

From the foregoing evidence we feel constrained to hold that the contract sued upon is unenforceable for the reason that the complainants, at the time same was executed, were dealers in real estate without having paid a privilege tax authorizing them to engage in such business. In addition to the foregoing, the record further shows that the county officials of Davidson county on several occasions undertook to collect such a tax from Mr. Kirtland, but that by various pretexts and subterfuges he evaded and avoided paying same.

The record demonstrates clearly that Mr. Kirtland was engaged in the business of buying and selling real estate in his wife's name. His wife has never owned any property except what he gave her, and while he under-

takes to create the impression that the titles to purchases made by him were taken in her name to provide her a competency after his death, he later admitted that both of them had made many purchases and sales, and finally concluded by saying that practically all of this valuable property purchased to support his wife after his death, had been sold.

Mr. Kirtland admitted that the property in question, although in his wife's name, belonged to him, as appears from the following question and answer:

"Q. What property did you own in your wife's name?

"A. Two pieces of property on Belmont boulevard south of Belmont College; two pieces of property on Seventeenth avenue, north of Belmont College; one piece of property on the corner of twentieth avenue and Bell-court street No. 1800 Twentieth Avenue South."

One of the pieces of property on Seventeenth avenue north of Belmont College is the lot in question.

But treating this piece of property as belonging to the wife, the evidence shows that it was purchased for the purpose of sale and, when taken into consideration with the numerous other purchases and sales made by Mrs. Kirtland, as testified to by Mr. Kirtland, we think the burden was on her to show that she was not engaged in the business of buying and selling real estate.

In *Gilley* v. *Harrell,* 118 Tenn., 128, 101 S. W., 427, Mr. Gilley testified: "I traded for notes. I did not have any license." Upon this evidence this court held that Mr. Gilley could not recover upon the note sued on in that case.

In the instant cause Mr. Kirtland testified: "We often sold and bought real estate."

The fact that the lot was improved after its purchase could not change the result. We are unable to draw any distinction between buying and selling improved property or unimproved property, or buying unimproved property, improving it, and then selling it. The fact that its condition has been changed after purchase and before sale could not affect the result. The gravamen of the offense is buying and selling real estate, as a business, without license, and the condition of the property when purchased or when sold is not material, and has no bearing on the question.

As this defense is fatal to the complainants' cause of action, it will be unnecessary to discuss the other assignments of error.

It results that the decree of the chancellor will be reversed and the bill of the complainants will be dismissed.

We are also of the opinion that the defendants flagrantly violated their contract with the complainants.

We therefore dismiss their cross-bill, and tax them and their sureties with all the costs of the cause, both in the lower court and in this court.